A. W. KINKEAD, Appellant, v. L. M. HARTLEY, Appellee.

**Brokers:** ACTION FOR COMPENSATION: EVIDENCE. Where no compensation was agreed upon for the services of a broker in procuring a loan, and the negotiations ceased and no loan of the character which he undertook to make was obtained, the broker was not entitled to recover compensation.

**Same:** AGENCY: DELEGATION OF POWER: EVIDENCE. It is the general rule that where an agency involves no judgment, discretion or personal skill the agent may delegate his power to a subagent. In the instant case the evidence touching the agent's power to employ a subagent to procure a loan is held sufficient to take that question to the jury.

**Same:** SUBAGENT: COMPENSATION. A subagent employed by the agent cannot recover compensation for his services from the principal, unless the agent had authority, either express or implied, to make the employment, and unless he has performed the agreement which was within the scope of the agent's authority.

**Same.** The defendant in this case offered his agent a commission if he would procure him a loan at a stated rate of interest, and the agent secured the services of plaintiff, agreeing to divide the commission with him. *Held*, that defendant was not liable to the subagent even though he introduced defendant to the parties, who subsequently made him a larger loan at a different rate, the original negotiations having been terminated.

*Appeal from Lee District Court.*—HON. HENRY BANK, JR., Judge.

THURSDAY, OCTOBER 23, 1913.

ACTION at law to recover a commission for securing a loan which was to be secured by mortgage upon defendant's land. Directed verdict for defendant at the close of plaintiff's testimony, and plaintiff appeals.—*Affirmed.*

*Herminghausen & Herminghausen,* for appellant.

*George B. Stewart,* and *J. C. McCoid,* for appellee.

DEEMER, J.—The petition is short, and simply states that on the 15th day of February, 1906, at defendant's instance and request, plaintiff procured a loan of $57,000 for him

1. BROKERS: action for compensation: evidence.

(defendant), for which he expressly undertook and agreed to pay plaintiff the sum of 1 per cent., or $570, and he asked judgment for that amount, with interest. The answer was a general

denial. The testimony adduced in support of the petition does not show that defendant himself had any negotiations with plaintiff regarding any loan until some time the latter part of the year 1906, when plaintiff met him (defendant) on the sidewalk in the city of Mt. Pleasant, Iowa. Plaintiff testified as follows, regarding that conversation: "   . . . I told Mr. Hartley Mr. Knight had spoken to me some time before about a loan of $45,000. He said there were parties then looking after it, that he couldn't make any arrangements with me at that time; but, if they failed, he or Mr. Knight would let me know about it.  . . ." The witness testified that he saw Knight about January 1, 1906, and testified to the following conversation with him: ".  .  . I never told Mr. Hartley that I had .no resources of my own, and would have to apply to a loan company. In the conversation with Mr. Knight in January, he said that the parties he had spoken of had failed in their efforts, and wanted to know if I could get the money, and what I would charge. I told him I thought I could get it if the security suited the parties, and would charge him, Mr. Hartley, 1 per cent. He told me to see what I could do.  .  .· ." He then testified that he went about finding the money, and got into correspondence with the Kewanee Savings Bank of Kewanee, Ill., or some of the officers thereof, and that as a result of his efforts one of the officers came to defendant's farm, looked it over, and talked about a loan. The next day plaintiff telephoned defendant, and defendant admitted that the bank official had been there, but that nothing had been done, that this official wanted a commission, and that he could not pay it and also pay plaintiff one. Plaintiff further testified:

. . . I told him I didn't know anything about that, that Mr. Fischer came there at my instance, and if the loan was made I should expect my commission. I afterwards went to Kewanee to see Mr. Fischer with regard to the loan. Mr. Fischer said that he had been there, but hadn't consummated the loan, but thought he would be able to do so, and explained

to me why it was that he didn't come through Mt. Pleasant, as he had telephoned me. After I had seen Mr. Fischer, I had a conversation about the loan with Mr. Knight about February 22, 1906. Said that Mr. Fischer had been at Hartley's the day before, and that Mr. Fischer and Mr. Hartley had come to Mt. Pleasant, and Mr. Fischer had gone home from there. Mr. Fischer did not call on me. In June Mr. Hartley informed me that there was nothing doing in that line at all. About the latter part of September I happened into the office of Judge Babb. He was examining the Hartley abstracts; that led me to believe that there was something doing. After that I had some correspondence with Mr. Fischer, which is Exhibit 3, received in the usual course of mail. I received Exhibit 4 in the usual course of mail. I am acquainted with the handwriting of Belle Hartley, the wife of L. M. Hartley. I received Exhibit 1 in the mail at Mt. Pleasant on the date it bears. It is in the handwriting of Belle Hartley. Before that letter I had written a letter and addressed it to L. M. Hartley, inclosed it in an envelope addressed to him, stamped, and mailed it. Exhibit 1 came almost immediately after my letter to Mr. Hartley. Before I received Exhibit 3, I had written a letter to the Kewanee Savings Bank, inclosed it in an envelope addressed to the Kewanee Savings Bank, stamped it, and deposited it in the post office, and Exhibit 3 was in response to that letter. Mr. Fischer was there the second time in relation to the loan about February, 1906.

The letters referred to in this testimony are as follows:

### Exhibit 1.

Salem, Iowa, Feby. 19, 1906.

A. W. Kinkead, Mt. Pleasant, Ia.—Dear Sir: Have done nothing at all in the loan matter, and see no prospect of business in that line. If you can get me the money at 5 per cent., I would be willing to pay you a commission. Would not be willing to pay it at any more. Yours truly, L. M. Hartley, B.

### Exhibit 3.

Kewanee, Ills., September 20, 1906.

Mr. A. W. Kinkead, Mt. Pleasant, Iowa.—Dear Sir: We have given up the Hartley loan. Respectfully, W. E. Gould, Cashier.

Exhibit 4.

Mount Pleasant, Iowa, 28 June, 1906.

L. M. Hartley, Salem, Iowa—Dear Sir: Do you still want that loan of $45,000, or $50,000, and will you take the loan if I secure it for you at 5 per cent.? Please let me know at once. Yours truly, A. W. Kinkead.

Dear Sir: Am not in position to take a loan at present. Yours truly, L. M. Hartley, B.

The first letter that plaintiff wrote regarding the loan is as follows:

Mt. Pleasant, Iowa, 2 Jan., 1906.

The Kewanee Savings Bank, Kewanee, Ill.—Gentlemen: I notice in our paper your adv. in regard to loans. Would you consider an application, for a loan of $45,000.00 on first rate farm security, worth double the amount of the loan, first lien, at not to exceed 5 per cent.? Very truly, A. W. Kinkead.

As a matter of fact, defendant did not procure from Fischer, trustee, a loan of $57,000, which was secured by a trust deed on 1,100 acres of land in Lee, Henry, and Des Moines counties, Iowa, and in Harlan county, Neb., and with the commission, paid to Fischer, the rate of interest exceeded 5 per cent.; the amount of the excess not being shown. This loan was procured or at least the trust deeds were executed in October of the year 1906.

Plaintiff testified:

Neither Mr. Hartley nor Mr. Fischer notified me of Fischer's second coming. When I met Mr. Hartley at Mt. Pleasant, I had learned that the loan had been made, and wanted the commission. Hartley said he did not think he owed me anything. He said he had to give Fischer a commission, and therefore didn't owe me any.

The last correspondence which plaintiff had with the bank was as follows:

Mount Pleasant, Iowa, 15 Sept., 1906.

Kewanee Savings Bank, Kewanee, Ill.—Gentlemen: What progress are you making in the Hartley loan? Yours truly, A. W. Kinkead.

Exhibit 3, already set out, was in response to this letter. The letters immediately preceding were as follows:

Kewanee, Ill., Jan. 19, 1906.

Mr. A. W. Kinkead, Mt. Pleasant, Iowa—Dear Sir: Your favor at hand asking about the Hartley matter. Will state that we called to see Mr. Hartley, but was unable to close up with him. The reason we did not come to Mt. Pleasant to see you was because the trains did not run so that we could do so. Mr. Hartley said he would communicate with you. We trust we shall be able to land the loan yet. Yours very truly, W. E. Gould, Cash.

Kewanee, Ill., Feb. 15, 1906.

Mr. A. W. Kinkead, Mt. Pleasant, Iowa—Dear Sir: We have not heard from Mr. Hartley lately, and, so far as we are concerned, it stands about the same as it did when you were here. Yours truly, W. E. Gould, Cash.

This is all the testimony relating in any manner to defendant's direct connection with plaintiff in the matter of the making of the loan, and, if it stood alone on this, it is perfectly manifest that there could be no recovery for two reasons: First, because no compensation was agreed upon for any services which plaintiff might perform; and, second, because the testimony shows that all negotiations were broken off, and the character of the loan which plaintiff undertook to procure was never obtained, and all negotiations with reference thereto were broken off.

II. Notwithstanding the nature of his pleading, plaintiff's counsel argue that they were entitled to have the case go to the jury on two theories: First, that one Knight, a brother-in-law of defendant, was appointed an agent by defendant to negotiate for a loan, with a definite understanding as to compensation for his services; and, second, that Knight was employed by

2. SAME: agency: delegation of power: evidence.

defendant to negotiate a loan for him (defendant), and that Knight with implied authority had a right to and did employ plaintiff as a subagent to negotiate the loan for an agreed compensation, that he did negotiate the loan as agreed, and is entitled to the compensation promised. The testimony, if there be any, in support of these claims comes from O. N. Knight, the witness already referred to, and from plaintiff himself, and some of the correspondence already quoted, and some other letters to which reference will be made. As the whole case turns upon the sufficiency of the testimony, it is necessary to set out that most favorable to plaintiff, in order that an intelligent conception may be had of the case.

Among other things, Knight testified to the following:

. . . Mr. Hartley wanted a loan, and he gave me the privilege of procuring one for him in 1901, and subsequent to that time. Mr. Hartley said he would give me $500 to get him a loan of $50,000, provided I would get it at five per cent. net to him. That was in 1901. I saw Mr. Kinkead about a loan. I do not know as to the date, being about August, 1905. I told Mr. Kinkead that I had been trying to get a loan for Mr. Hartley for $50,000 or more, and that there was $500 in it if I could get it at five per cent., and he said he thought he could arrange to get the money, and in case he did we was to divide the commission. The commission was to be divided if we got a straight five per cent. loan, as Mr. Hartley would not pay any commission if he had to pay more than five per cent. He never agreed to pay me if he had to pay more than five per cent. I think it was in the winter of 1905. I had been trying to get this loan through other parties, and had not succeeded; but I don't know whether I made that kind of statement to Mr. Kinkead or not. I reported to Mr. Hartley that I was trying to get this loan through other parties. It was in the winter Mr. Kinkead told me that a party from Kewanee, Ill., was coming up to see about the loan. He showed me a letter from those parties; but I do not remember the names. I either read it, or he read it to me; I do not remember. I did not report to Hartley that the man was coming to inspect the farm relative to placing the loan. I said the next day we would get a buggy and drive over to

Hartley's. I never saw the man. I do not remember how I learned that Mr. Fischer had been at Hartley's. He didn't come to Mt. Pleasant when he promised to. I don't remember whether Mr. Hartley or Mr. Kinkead told me that he was out there that day. Mr. Kinkead and I talked together about the matter of loan and letters he received. I do not remember what our conversations were. At the several times that Mr. Kinkead showed me letters I communicated with Mr. Hartley, and afterwards again communicated to Mr. Kinkead what I had received. I submitted a proposition to Mr. Hartley to get him a loan at a little higher rate; but he wouldn't consider a higher rate and pay me any commission. I communicated that to Mr. Kinkead. I think Hartley got a loan on his farm, and I asked Mr. Hartley if he got it at five per cent. If he did, I thought there was a commission coming to me; he said he had paid a higher rate than that. He got the loan from those Kewanee people, Mr. Fischer. Mr. Kinkead never brought anybody to me about this loan, and I never took anybody to Mr. Hartley. I didn't communicate to Mr. Hartley that the Kewanee Savings Bank was willing to make the loan until after those people were at Hartley's. I then told him they were the people we had been trying to get the loan from, and were instrumental in getting them there. It was the next day after he told me they were at Hartley's. Mr. Kinkead said they dodged us, and did not go through Mt. Pleasant. Mr. Kinkead knew that I was offered 1 per cent. commission for procuring the loan, and he said we would divide the 1 per cent. He wasn't to get 1 per cent. I handed him a sketch of the Hartley farm at that time, and a photograph of the barn on the farm. I sent Mr. Kinkead some photographs; yes. Mr. Kinkead agreed to give me one-half, or I agreed to give him one-half of 1 per cent. on $50,000. I first spoke to Mr. Hartley about the loan that I had negotiated with Mr. Kinkead after he procured the loan. It was in the fall; I think several months after. I don't know whether in 1905, 1906, or 1907. After I heard they got the loan closed up, I asked them, either my sister or Mr. Hartley, if they got it. He said he would not make the loan. I talked to Mr. Hartley frequently over the telephone; but I do not remember any specific conversation. . . . I asked Mr. Hartley about the commission after his farm loan was secured with the Kewanee people. If he got it at five per cent. straight, I thought there was a commission coming,

because I understood it was the same parties that Mr. Kinkead and I had come to go over to see about the loan. We informed them that those were the parties that we tried to get the loan from. I spoke to Mr. Hartley relative to a commission about the loan that was finally placed by him. Yes, sir; I think he understood that we, Mr. Kinkead and I, were together in the transaction. I mentioned Kinkead to Mr. Hartley right away after Mr. Fischer was there the first time. I do not know what the conversation was, only I wanted him to understand that Mr. Kinkead and I were instrumental in getting that man there, so if we got a loan of that kind we would have a commission coming.

The conversation was with Mr. Hartley or Mr. Hartley's wife after the loan was consummated. The agreement between me and Mr. Hartley was that, if I would get him a loan of $50,000, he would give me $500, provided I got it at five per cent. net to him. I never talked with Mr. Hartley about Kinkead until after the loan was consummated. I told Kinkead that Mr. Hartley would not consider paying commission on a higher rate than five per cent. flat. After the loan was transacted, Mr. Kinkead came to see me about the commission. I said to Mr. Kinkead that 'we have not complied with our agreement, we did not get the loan at five per cent. and I don't think we are entitled to anything.' I told Kinkead that, if the rate was more than five per cent., I did not expect anything from Hartley. The loan was to be on the farm he then had, which was 800 acres in Henry county. No loan of that kind was ever procured for Hartley; Mr. Kinkead did not deny that. I don't consider there was anything due us. I told Kinkead that I never claimed any commission. I never talked to Kinkead about a $57,000 loan. Mr. Kinkead said there was a commission due him. The loan was to be $50,000, or he could use more if we could get it, and my understanding was that we was to have 1 per cent.; but he couldn't use less. Mr. Kinkead reported to me that he thought he could get the $50,000 at straight five per cent., and told me the party was coming. I never reported that a loan was ever procured for Mr. Hartley.

The first conversation I had with Mrs. Hartley about the loan was after it was consummated. She said they did not get the loan at 5 per cent. It was in the fall of the year. I don't know whether it was in 1905 or 1906. I told Mr. Kinkead at Mt. Pleasant about the conversation with Mrs.

Hartley. Mr. Kinkead was in the loan business. I was not in the loan business in Henry county, Iowa; only this one loan was all.. We were trying to find parties that would make this loan for Mr. Hartley. I was to furnish a description of the farm, write it up, and show up the security as best I could. I got a business card and photograph of the farm from Mr. Hartley. I got them from the place by the hundred. I was doing quite a little advertising for Mr. Hartley at different times. Mr. Hartley said he would give me $500 if I would get him a loan of $50,000 at five per cent., but said he would not pay any commission if he had to pay more than five per cent. interest. That is before I saw Mr. Kinkead. I had mentioned to Mr. Hartley where I had tried to get him money, and he always said to 'go ahead if you can get five per cent. money.' I did not have any resources for placing the loan without applying to some loan agent. Hartley was never present when I talked to Kinkead.

In addition to the testimony of the plaintiff already quoted, he testified as follows:

. . . I was applied to for a loan for the Hartley land about September, 1905, by Mr. Knight, the brother-in-law of Mr. Hartley. Mr. Knight told me that Mr. Hartley wanted to refund his indebtedness; that he had about $45,000, and wanted $45,000 more to fund the whole amount of his indebtedness. He said he had other parties working on the matter at that time, and in the event of their failure he wanted to know if I could furnish the money. I said I thought I could, if the security was satisfactory to the parties. He said, if the parties who were then trying didn't succeed, he would let me know. By he, I mean Knight. . . . After the conversation with Mr. Knight in January, I proceeded to find the money. I corresponded with different individuals and corporations, and went to see some. I received communications by letter from the Kewanee Savings Bank of Kewanee, Illinois. I showed the correspondence to Mr. Knight, who read it. Mr. Knight said that I had better press the matter. He gave me a picture and plat of the place. I inclosed the plat and the card to the Kewanee Savings Bank. After some correspondence, Mr. Fischer, the president of the Kewanee Savings Bank, telephoned me that he would meet me at Mt. Pleasant

on the next morning to look at the Hartley farm. I told Mr. Knight I had just received a phone message from Mr. Fischer, saying he would be in Mt. Pleasant the next morning, and I would have to arrange to take him over, and he said that was right. Mr. Knight was to go with us. I waited; but Mr. Fischer did not come to Mt. Pleasant. I examined the hotel register, and did not find his name, and told Mr. Knight that Fischer had not come. I learned that Fischer was at Hartley's on that day, and went back through Mt. Pleasant. I telephoned Mr. Hartley the next day. Mr. Hartley said Mr. Fischer had been there, but had not done any business, that Mr. Fischer wanted a commission himself if he made the loan, and he said it would be kind of hard if he had to pay him a commission and me one too. . . .

I wrote the letter of September 15th because I learned negotiations were pending between Hartley and Fischer. I did not write Fischer between June and September. I first made demand upon Hartley for compensation some time in 1906 or 1907. I can't remember the month, the day of the month, or the day of the week. I have no letters signed by Mr. Hartley. I only had one conversation with Mr. Hartley about this loan prior to September 20, 1906. I only telephoned him once prior to that time. . . . At that time I did not consider the matter off, sir, simply because, as I said a while ago, Mr. Fischer and Mr. Hartley were both trying to circumvent me, and there had been a silence on the subject for some time, and I wrote that simply to draw Mr. Hartley out, to find out what was being done; that was the purpose of that letter and one to Mr. Fischer.

I wrote the letter, Exhibit 12, to the Kewanee Bank. My purpose in writing the letter was because of the attitude of Mr. Fischer and Mr. Hartley. There had been a silence upon the subject, and Mr. Hartley, through the letter spoken of (Exhibit 4), had said there was nothing doing along that line, and I knew the abstracts were being examined at the time, about September 20th, and I wrote Mr. Fischer simply to draw him out the same as I did Mr. Hartley. Exhibit 3 is a response to Exhibit 12. The abstract of title to Mr. Hartley's land was being examined by Judge Babb, and he informed me that he was passing on the title to the Hartley farm for Mr. Fischer, president of the Kewanee Savings Bank. In my conversation with Mr. Fischer at Kewanee he said that he was coming over again shortly, and would then see that I

was notified when he was coming, and that he would come to see me, and also tell Mr. Hartley to inform me, and Mr. Hartley informed me that Fischer had been there on the first trip about the 18th of January. . . . I first learned there had been a $57,000 loan made on the Hartley farm after the instruments were filed in our county. I learned it from the records. I did not know it had been consummated until the instruments were filed. I learned about the $2,500 mortgage the same day I filed the petition.

Aside from the letters already set out and some others, which are not regarded as material, this is all the relevant testimony in the case, and the sole and only question is, Was there enough to take the case to a jury on the issues made by the pleadings? We think there was sufficient to take the case to the jury upon the proposition of agency, express or implied, on the part of Knight, to employ plaintiff either as an agent or subagent for defendant in procuring a loan. There is some testimony indicating express authority in Knight to employ plaintiff as an agent, and more tending to show that he (Knight) was authorized to employ a subagent in finding money for the defendant. The general rule seems to be that, save where an agency involves judgment, discretion, or personal skill an agent may delegate his powers to a subagent. *Renwick v. Bancroft,* 56 Iowa, 527. And there is testimony in this case which would warrant a jury in finding that defendant knew Knight would have to find some one to furnish or procure the money for Hartley. In such circumstances authority to employ a subagent will be implied. Mechem on Agency, section 196, and cases cited.

Although this be true, there remains another question. From whom was plaintiff to get his commission, in the event one was earned? If, by the terms of his employment, he was to get his compensation from Knight, although the money was to be procured for Hartley, of course, Knight alone would be responsible; but if he were employed by Knight, under authority, express or implied, from Hartley, then he may

3. SAME: sub-agent: compensation.

claim his compensation from defendant, provided he complied with the terms of his agreement with Knight, and that agreement was within the scope of Knight's authority from Hartley.    Appleton v. McGilvray, 4 Gray (Mass.) 518 (64 Am. Dec. 92); *Sexton v. Weaver,* 141 Mass. 273 (6 N. E. 367).

Although the testimony is rather meager upon the proposition, we are disposed to hold there was enough to justify a finding that Knight had authority to employ plaintiff as a subagent, but that his authority was limited.

4. SAME.

Knight himself testified that his authority was to find a loan for $50,000, at 5 per cent. net to Hartley, for the sum of $500; that he told Kinkead of his authority, and proposed to divide the commission with him, in the event he could secure a loan for that amount at the rate of interest named.    No other authority in Knight is shown, save by plaintiff's testimony as to what Knight said to him, and what he (plaintiff) said to Knight as already quoted.    But plaintiff expressly testified that Hartley wanted the loan at 5 per cent.    He also said that nothing was said about 5 per cent. net to Hartley.    But his first letter to the Kewanee Bank, under date of January 2d, before quoted, which he said embodied his understanding with Knight, expressly stated that the interest was "not to exceed 5 per cent."    Again, in the first letter from Hartley to Kinkead (Exhibit 1), under date of February 10, 1906, he (defendant) said that he would be willing to pay plaintiff a commission, if he could get the money at 5 per cent.    That Kinkead so understood it is evidenced by his letter of June 28th (Exhibit 4), already quoted.    Now the record shows that the loan was not obtained for Hartley at 5 per cent. net to him.    Indeed, the contrary appears from the uncontradicted testimony.    Moreover, it quite conclusively appears that the original efforts to obtain a loan for from $45,000 to $50,000 were abandoned shortly after Fischer made his first trip to see the land.    This is apparent from Gould's letters (Exhibits 9 and 10), under date of January 19 and

February 15, 1906, respectively, and defendant's letter (Exhibit 1), under date February 19th, heretofore set out.

In so far as the record discloses, nothing was done thereafter until plaintiff wrote the letters of June 28, 1906 (Exhibit 4), which was responded to by defendant as indicated on the letter itself. According to plaintiff's own testimony, he did nothing further in the matter after about February 22, 1906, except to speak to Mr. Hartley in June of that year, when Hartley informed him there was nothing doing in the loan matter at all, and, in so far as the record discloses, there was no resumption of negotiations between defendant and Fischer or the Savings Bank until some time in the latter part of September of the year 1906. At about that time, however, the plaintiff had some information that negotiations had been resumed, and he wrote the bank the letter (Exhibit 12), under date September 15th, to which the bank responded by letter, written September 20th (Exhibit 3).

It may be that the bank misrepresented the situation at that time; but there is nothing showing that defendant had any connection therewith, and it affirmatively appears without any contradiction that the loan when finally obtained bore more than 5 per cent. interest net to defendant, and that the original negotiations for a 5 per cent. loan were entirely broken off not later than February 15, 1906, and that they were not resumed until some time in September of the year 1906, and were then consummated on an entirely different basis from that proposed to Knight and Kinkead. The loan was increased to $57,000, the rate of interest was increased, and the amount of security required largely extended. Indeed, the loan finally obtained was not on the basis of the first proposition at all. Under such a state of facts, plaintiff was not entitled to a verdict, and if one had been returned it would have been the duty of the trial court to set it aside.

There is no evidence of any fraud on the part of the defendant. There was, it is true, apparently some conceal-

ment on the part of the bank; but it is not shown that defendant was in any way connected therewith, or that he was trying to evade the payment of a commission which he might owe the plaintiff if the truth were known. Our conclusion finds support in the following, among other cases: *Richmond v. Greeley*, 38 Iowa, 666; *Ball v. Sykes*, 70 Iowa, 525; *Park v. Hogle*, 124 Iowa, 98; *Jones v. Buck*, 147 Iowa, 494; *Hurd v. Neilson*, 100 Iowa, 555. The two cases last cited are closely in point, and the rules there announced must govern here.

There was no error in directing the verdict, and the judgment must be and it is *Affirmed*.

WEAVER, C. J., and GAYNOR and PRESTON, JJ., concur.